IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| PENNY L. LANE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CV-445 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth herein, defendant's motion for summary judgment [doc. 19] will be granted, and plaintiff's motion for summary judgment [doc. 14] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff applied for SSI in January 2003, claiming to be disabled by back and leg pain, hypertension, and "nerves." [Tr. 52, 58]. She alleges a disability onset date of April 1, 1998. [Tr. 52]. Plaintiff relates her purported pain to a motor vehicle accident

which she has stated occurred in 1986 [Tr. 234], 1989 [Tr. 73, 136, 262, 317], 1992 [Tr. 356], and/or 1999 [Tr. 258]. She relates her anxiety and depression to allegedly suffering either one [Tr. 262] or three [Tr. 136-37, 234-35] miscarriages in the early 1990s.

Plaintiff's claim was denied initially and on reconsideration. She then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on May 17, 2005.

On October 26, 2005, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from "combined impairments which are 'severe' including degenerative disc disease, depression, anxiety, high blood pressure, restless leg syndrome, chronic obstructive pulmonary disease and obesity but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in[,] Appendix 1, Subpart P, Regulations No. 4." [Tr. 23]. Of particular relevance to this appeal, the ALJ determined that plaintiff's depression and anxiety would cause no more than moderate limitations in the workplace. [Tr. 21-22]. Citing inconsistent claims, minimal objective evidence, and actions "suggestive of drug seeking behavior," the ALJ further concluded that plaintiff's allegations are "not totally credible" and that she retains the residual functional capacity to perform a full range of light work. [Tr. 19-20, 22-23]. Applying Grid Rule "202.24," the ALJ concluded that plaintiff is not disabled and therefore is ineligible for SSI benefits. [Tr. 23-24].[1]

---

[1] The Commissioner submits (and plaintiff does not contest) that the ALJ's reference to Grid
(continued...)

Plaintiff then sought review from the Commissioner's Appeals Council. On September 27, 2006, review was denied, notwithstanding plaintiff's submission of four pages of additional medical records. [Tr. 6, 9].[2] The ALJ's ruling became the Commissioner's final decision. *See* 20 C.F.R. § 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Background and Testimony*

Plaintiff was born in 1970 and has an eleventh grade education. [Tr. 52, 137]. She stands approximately 5' 4" tall and weighs as much as 310 pounds. [Tr. 259]. Plaintiff testified (and told one doctor) that she has worked for only a single day since 1990. [Tr. 263, 346]. She twice told another medical source that she worked for a month and a half in 2002. [Tr. 137, 235]. Elsewhere, she appears to claim a seventeen year history of factory work "from 1984 til 2001." [Tr. 59].

---

[1](...continued)
Rule 202.24 was a typographical error (since no such rule exists) and that 202.17 is in fact the applicable rule in this case.

[2] Plaintiff's additional documents are discussed in her brief and are included in the administrative record. [Tr. 332-36]. This court can remand a case for further administrative proceedings where a claimant shows that late-submitted evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). Plaintiff, however, has made no effort to articulate how her evidence warrants sentence six remand, nor has she even cited sentence six. The issue is accordingly waived, and the additional evidence has *not* been considered by this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate."); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

Plaintiff alleges that she is in constant leg and back pain. [Tr. 69]. She informed the Commissioner that she is unable to independently perform most household chores because of difficulties with bending, lifting, and pulling. [Tr. 76, 108]. She testified that she can stand for no more than ten minutes at a time and sit for no more than twenty minutes. [Tr. 350-51]. She purportedly "can't go walking" and "can't hardly walk." [Tr. 104, 353].

The Commissioner referred plaintiff's case to his Cooperative Disability Investigations Unit ("CDI") "to investigate possible work concealment and malingering." [Tr. 98]. Following three witness interviews (presumably neighbors), the CDI concluded that plaintiff "might be exaggerating her disabilities in order to become entitled to benefits." [Tr. 98]. The witnesses reported that plaintiff has offered to do housework for two of them, that she daily walks up and down her "steep declining driveway" to retrieve mail, and that she can "walk[] around her neighborhood without any assistive devices." [Tr. 99-100].

Further, despite her purported infirmities, plaintiff is able to (on multiple occasions) "assault" or "get[] into physical fights with" her sister and sister-in-law. [Tr. 235-37]. She is admittedly able to shop and attend flea markets on at least an occasional basis, and she cooks two or more meals per day. [Tr. 237].

III.

*Relevant Medical Evidence and Opinions*

A. <u>Physical</u>

In January 2000, nearly two years after her alleged disability onset date, plaintiff complained to Dr. Harjeet Narula that a back ache had occurred "suddenly" after "lift[ing] some weight." [Tr. 184]. Later that month, plaintiff complained of knee pain. Dr. Narula noted normal knee movement and only slight tenderness. [Tr. 183]. In June 2000, plaintiff reported "some back problem" requiring an "occasional muscle relaxer or analgesics" [Tr. 178], which Dr. Narula had apparently been providing her for at least the previous six months [Tr. 178-84]. Plaintiff was "otherwise feeling good" and Dr. Narula suspected that the occasional back problems were secondary to obesity. [Tr. 178]. The following month, plaintiff complained of depression and anxiety but "overall ha[d] been feeling good." She nonetheless wanted a refill of her prescriptions. [Tr. 176].

In March 2001, Dr. Murugensen Dhandapani examined plaintiff and described her as "comfortable, not in any acute distress." [Tr. 175]. An April 2002 lumbar MRI showed a "relatively broad" disc protrusion at L4-5 and a smaller protrusion at L3-4. There were no herniations, and all other lumbar disc spaces were normal. [Tr. 197]. Plaintiff returned to Dr. Dhandapani in December 2002 to have her medications refilled. [Tr. 174]. Examination showed no spinal tenderness. Straight leg raising was within normal limits, and neurological examination was intact. [Tr. 174].

5

Plaintiff returned to Dr. Dhandapani in January 2003 complaining of chronic back pain. No spinal tenderness was noted, and straight leg raising was again within normal limits. The narcotic prescription was again refilled, although Dr. Dhandapani "[r]ecommended her to take it strictly on prn basis for severe pain." [Tr. 172]. Plaintiff renewed her complaints of knee pain in April 2003, but Dr. Dhandapani's examination of the knees was within normal limits. He nonetheless instructed plaintiff to continue with her prescribed pain medications, per plaintiff's request. [Tr. 169].

Dr. James Wike of St. Mary's Medical Center Pain Management ("SMMC") performed a caudal injection in February 2003. [Tr. 219-20]. On examination, he also noted bilateral paraspinous muscle spasm and left sciatic notch tenderness. [Tr. 217]. SMMC Dr. Mark Nelson performed a second injection two weeks later. [Tr. 214]. Dr. Nelson had "her sign a narcotic pain management contract today and the rules and such were explained to her." [Tr. 213]. At her third injection in March 2003, Dr. Wike noted plaintiff's report that, "She also is starting her physical therapy program and says she feels the best she has felt in five years." [Tr. 211].

The following month, Dr. Nelson wrote that plaintiff "does well with her self care. She has a normal family role. She reports some leisure activities, an overall low to moderate activity level. Her mood is good, appetite is good, and sleep is good. I have refilled her medications for a three month supply." [Tr. 210]. Dr. Wike's July 1, 2003 notations were similar, except he described plaintiff's overall activity level as "high." [Tr.

209].³ That day, he "obtained a urine drug screen . . . for routine procedure." [Tr. 209]. Plaintiff failed the drug screen and was discharged from SMMC.⁴

In October 2003, plaintiff underwent a physical consultative examination by Dr. Joseph Johnson. Dr. Johnson observed a mildly reduced range of motion in the back and hips, and good range of motion and strength in the knees. [Tr. 223]. He predicted that plaintiff could sit for six or more hours per workday, stand for three hours, routinely lift fifteen pounds, and occasionally lift up to twenty pounds. [Tr. 224]. Dr. Robert Burr then completed a Physical RFC Assessment, predicting that plaintiff could perform light work with no significant nonexertional limitations. [Tr. 227-33].⁵

In November 2003, plaintiff returned to Dr. Dhandapani for a refill of her pain medications "just to help her get through when she has a bad spell." [Tr. 305]. Noting that plaintiff had been "fired from" a prior pain clinic for noncompliance, Dr. Dhandapani gave a short-term refill to be used only as needed for severe pain. He further wrote that he would "try to refer her to another pain clinic for pain management. I strictly told the patient that I

---

³ Of note, Dr. Wike termed plaintiff's activity level "high" a mere eighteen days before plaintiff told the Commissioner that "I'm am [sic] not standing or walking much because it hurts my back and legs too much." [Tr. 88, 91].

⁴ Plaintiff has attempted to explain this event by stating that she accidentally took one of her son's pain pills. [Tr. 258, 262, 347]. However, this explanation was not accepted by the SMMC staff. [Tr. 258, 262, 347-48]. It is noteworthy that plaintiff claimed it was a Darvocet that she inadvertently took [Tr. 258], but less than one month later claimed it was a Percocet [Tr. 262]. Moreover, the administrative record indicates that plaintiff has also been discharged from one or more other pain clinics for failing drug screens. [Tr. 261, 293, 296-97].

⁵ An earlier Physical RFC Assessment by Dr. K. Shannon Tilley concluded that plaintiff could work at the medium level with no significant nonexertional limitations. [Tr. 158-62].

7

won't be able to refill her pain medication on long term basis." [Tr. 305].

At an appointment with Dr. Dhandapani's nurse practitioner Melissa Welden one month later, plaintiff again "c[ame] into the clinic today requesting pain medication refills[.]" [Tr. 304]. On examination, plaintiff appeared comfortable and there was only "some mild discomfort to the lower back." Plaintiff was provided a refill of her pain medication. [Tr. 304]. Plaintiff returned to CFNP Welden three weeks later, again for medication refills. She again was described as appearing "comfortable," and was again provided a refill of her pain medication. [Tr. 303].

On January 22, 2004, plaintiff again requested medication refills. Dr. Dhandapani again described her as "comfortable," and his examination of the back and legs was unremarkable. Plaintiff was again given medication refills. [Tr. 301].

At her annual examination with CFNP Welden in February 2004, plaintiff again requested medication refills. She was again described as comfortable and in no acute distress. Medication refills were again provided. [Tr. 302].

At March and April 2004 appointments, plaintiff continued to request medication refills. Objective findings were unremarkable except for "few crepitus" and "[v]ery mild restriction of [range of motion] noted in her knees." Medication refills were again provided, but Dr. Dhandapani again wrote that he "[e]xplained to her that I won't be able to prescribe her narcotics any further. She needs to see the pain clinic for pain management." [Tr. 299-300].

In April 2004, plaintiff appeared for an initial evaluation with Dr. Michael Dykes of Pain Management, PLLC. Dr. Dykes noted slight swelling and crepitus in the right knee, a disc protrusion at L4-5, and "very mild right L5 radicular symptoms." [Tr. 260]. Emphasizing exercise and weight loss, Dr. Dykes scheduled a return appointment pending behavioral medicine evaluation and a urine drug screen. [Tr. 260-61]. Dr. Dykes's records show no further treatment.

According to the records of Dr. Dhandapani, plaintiff was "discharged from [Dr. Dykes's] practice even before seeing the pain specialist" due to a failed drug screen. [Tr. 293]. In the meantime, Dr. Dhandapani had again refilled plaintiff's hydrocodone prescription on April 22, 2004. [Tr. 297]. However, on May 11, 2004, noting that "[e]very time she comes in she comes in for refills on her pain medication," Dr. Dhandapani "[r]efused to give Hydrocodone." [Tr. 296]. Examination of the back that day was "unchanged," and leg examination was unremarkable. May 20, 2004 examinations were also unremarkable, and plaintiff's renewed request for hydrocodone was again denied by Dr. Dhandapani, who instead provided the muscle relaxant Robaxin and the non-narcotic pain reliever Ultram. [Tr. 295]. Plaintiff returned to CFNP Welden one week later, claiming to have misplaced her Robaxin prescription. CFNP Welden "would not refill the Robaxin," and examination was again unremarkable. [Tr. 294].

Having been discharged from Dr. Dykes's clinic, plaintiff returned to Dr. Dhandapani on June 17, 2004, again requesting pain medication. Examination was again

unremarkable, although Dr. Dhandapani referenced plaintiff's 2002 lumbar MRI. He again provided hydrocodone and again "[e]xplained to patient that I won't be prescribing her narcotics any more. . . . Needs to find another provider who can help her with her pain medications." Dr. Dhandapani also planned to "take appropriate measures" regarding a conversation that plaintiff had with his receptionist. [Tr. 293]. Nonetheless, despite further unremarkable examinations, Dr. Dhandapani continued to provide Hydrocodone, Robaxin, and/or Ultram refills at plaintiff's July, August, September, and October 2004 appointments. [Tr. 288-92].

Drs. Steven Plenzler and Jamal Isber diagnosed mild sleep apnea in June 2004. They recommended conservative treatment "plus exercise and very significant weight loss." [Tr. 268-69]. In October 2004, Dr. Isber wrote that "her minor sleep apnea is probably resolved now." [Tr. 265].

Plaintiff had several appointments with the Primary Care and Pain Relief Center in late 2004 and early 2005. The notes of that provider are essentially illegible. [Tr. 307-27].

In January 2005, Dr. Dhandapani again noted crepitus and mildly restricted range of motion in the right knee. He continued plaintiff's prescriptions. [Tr. 287]. In April 2005, Dr. Dhandapani completed a Medical Assessment of Ability to Do Work-Related Activities (Physical). Therein, he opined that plaintiff could: frequently lift less than ten pounds; stand/walk no more than three hours per day, no more than thirty minutes at a time;

10

sit no more than two hours per day, no more than twenty minutes at a time; push, pull, and reach only on a limited basis; not work around heights, moving machinery, or vibration; and never stoop, kneel, balance, crouch, or crawl. [Tr. 284-85]. In support for his opinion, Dr. Dhandapani cited lumbar protrusions at L4-5, arthritis, and degenerative joint disease of the knees. [Tr. 284].

## B. Mental

Psychological examiner Pamela Branton performed an evaluation in March 2003. After testing [Tr. 137, 139], Ms. Branton diagnosed depression and wrote that concentration, understanding and remembering directions, and short-term and remote memory "appeared" to be "limited" or "somewhat limited." [Tr. 139].[6]

Ms. Branton performed a second consultative evaluation in November 2003, diagnosing depression and personality disorder. [Tr. 238]. She wrote that plaintiff "appeared" to be "limited" or "somewhat limited" in: understanding and remembering directions; short-term, recent, and remote memory; social interaction; and handling stress in the workplace. [Tr. 238].[7]

---

[6] State agency clinical psychologist Deborah Abraham then completed a Mental RFC Assessment and predicted that plaintiff would be no more than moderately limited in any mental activity. [Tr. 140-42].

[7] State agency clinical psychiatrist Bradley Williams then completed a Mental RFC Assessment and predicted that plaintiff would be no more than moderately limited in any mental activity. [Tr. 240-42].

Prior to plaintiff's discharge from Dr. Dykes's pain clinic, clinical psychologist Greg Foreman conducted a May 2004 behavioral medicine evaluation. [Tr. 262-64]. He diagnosed anxiety disorder, major depression, and pain disorder. [Tr. 263]. The evaluation and conclusions appear to have been based wholly on plaintiff's self-reporting. [Tr. 262-64].

IV.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at

529. The burden shifts to the Commissioner at step five. *Id.*

V.

*Analysis*

Where a claimant is found to be *physically* capable of performing the full range of work at a particular level, the Commissioner may meet his step five burden by referencing the medical-vocational guidelines ("the grid") unless the claimant has *nonexertional* impairments of sufficient significance. *See Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771-72 (6th Cir. 1987). Nonexertional impairments are mental, sensory, or environmental. *See id.* at 772. In the present case, the ALJ concluded that plaintiff's nonexertional impairments were of no more than moderate severity. He accordingly relied on the grid to direct a finding of "not disabled."

Plaintiff contends that the ALJ erred in using the grid. Primarily, she argues that her purported depression and anxiety cause significant nonexertional impairments. Plaintiff cites the mild to moderate restrictions predicted by Ms. Branton and the file-reviewing mental sources. However, to preclude use of the grid, a limitation must *significantly* or *severely* restrict the ability to work. *See id.* A minor or merely possible restriction is insufficient. *See Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). The present ALJ did not err in concluding that the "moderate," "mild," and "appeared to be limited or somewhat limited" opinions in this case did not equate to *significant* or *severe* impairment.

14

The mental health assessments are further weakened by their reliance on plaintiff's self-reporting. Ms. Branton's opinions, and thus also those of the file-reviewing sources, were based largely on plaintiff's self-reports, and Dr. Foreman's evaluation appears to have been based wholly on those self-reports. Substantial evidence supports the ALJ's conclusion that plaintiff's complaints are, at best, not fully credible. The court notes: the overall "high" activity level cited by Dr. Wike in July 2003; behavior (interactions with Dr. Dhandapani's office and the pain clinics) highly-suggestive of drug seeking; and the juxtaposition of plaintiff's claimed limitations (virtual inability to walk, lift, pull, or bend) against evidenced physical activities such as offering to clean neighbors' homes, walking around her neighborhood unassisted, and "assaulting" her family members. The court will not disturb the ALJ's credibility findings in this case. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).

Plaintiff next argues that the ALJ's inclusion of depression and anxiety in his step two "severity" analysis means that those conditions must also therefore "significantly limit" her ability to do basic work activities at step five. Plaintiff cites Social Security Ruling 96-3p which states in material part, "*At step 2 of the sequential evaluation process*, an impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities[.]" SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996) (emphasis added).

Obviously, SSR 96-3p pertains to the Commissioner's analysis at step two rather than step five. The "severe" impairment threshold of *step two* is a "*de minimis* hurdle . . . employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988) (citation omitted). An applicant is rejected at step two only if the alleged impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted). Moreover, the court notes that SSR 96-3p alternatively describes the step two "significantly limits" threshold as meaning merely "having more than a minimal effect[.]" SSR 96-3p, at *1-2. In sum, step two and step five are two different creatures. The ALJ's inclusion of anxiety and depression among his finding of "combined impairments which are 'severe'" at step two simply is not probative or binding regarding his step five application of the grid. *Cf. Todd v. Apfel*, 8 F. Supp. 2d 747, 757 (W.D. Tenn. 1998) (affirming use of the grid where step two "severe" impairments "do not impose any significant limitations on the claimant's ability to perform a full range of work at the given exertional level.").

Lastly, plaintiff criticizes the ALJ for not adopting the medical assessment of Dr. Dhandapani which, if credited, would preclude all work. The opinion of a treating physician is entitled to great weight if supported by sufficient clinical findings consistent

with the evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). However, the Commissioner may reject the opinion of a treating physician if it is not supported by sufficient medical data and if a valid basis is articulated for the rejection. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

In the present case, the ALJ did not assign controlling weight to Dr. Dhandapani's opinion because he found that it exceeded the supporting objective data. [Tr. 19-20]. That conclusion is supported by substantial evidence. Certainly, Dr. Dhandapani cited the results of plaintiff's 2002 lumbar MRI and he occasionally observed crepitus and mildly restricted motion in the knee. This is evidence of conditions that could reasonably be expected to cause some discomfort. *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986). However, a reasonable fact-finder could conclude that plaintiff's documented conditions are not "of such a severity that [they could] reasonably be expected to produce the alleged disabling pain." *See id.* at 853. Plaintiff's extreme subjective complaints simply are not consistent with the record as a whole, both in terms of her generally unremarkable physical examinations and in terms of the inconsistencies and credibility issues noted throughout this opinion.

The ALJ's RFC findings were a reasonable synthesis of the opinions of Drs. Johnson, Tilley, and Burr. The substantial evidence standard of review permits that "zone of choice." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Even assuming *arguendo*

that a reasonable mind could have perhaps concluded differently on the ultimate issue of plaintiff's disability, that is not the standard of review binding this court. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The decision of the Commissioner was supported by substantial evidence and therefore must be affirmed. An order consistent with this opinion will be entered.

                      ENTER:

                      s/ Leon Jordan
                      United States District Judge